873 F.2d 1494
 277 U.S.App.D.C. 237
 LACLEDE GAS COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Mississippi River Transmission Corporation, United Municipal
Distributors Group, Entex, a Division of ARKLA,
Incorporated, United Gas Pipe Line Company, Texas Eastern
Transmission Corporation, Intervenors.
UNITED MUNICIPAL DISTRIBUTORS GROUP, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Entex, a Division of ARKLA, Incorporated, et al., Laclede
Gas Company, Mississippi River Transmission Corporation,
Southern Natural Gas Company, Pennzoil Company, United Gas
Pipe Line Company, the Process Gas Consumers Group, et al.,
Texas Eastern Transmission Corporation, Bay State Gas
Company, Intervenors.
 Nos. 88-1325, 88-1326.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 7, 1989.
Decided May 5, 1989.
 
 Kenneth J. Neises, with whom Susan N. Kelly and James H. Byrd, Washington, D.C., for petitioners.
 Lorna J. Hadlock, Atty., F.E.R.C. (FERC), with whom Catherine C. Cook, Gen. Counsel, FERC, and Joseph S. Davies, Deputy Sol., FERC, Washington, D.C., Joel M. Cockrell and Jerome M. Feit, Washington, D.C., Attys., FERC, for respondent.
 
 
 1
 Joseph R. Hartsoe, with whom Stephen R. Melton, Houston, Tex., for intervenor United Gas Pipe Line Co.
 
 
 2
 Karen Lynn Newman, for intervenor Mississippi River Transmission Corp.
 
 
 3
 Susan N. Kelly and James H. Byrd, Washington, D.C., for intervenor, United Mun. Distributors Group.
 
 
 4
 Michael J. Manning and James P. White, Washington, D.C., for intervenor Entex, A Div. of ARKLA, Inc., et al.
 
 
 5
 Michael R. Waller, Houston, Tex., and Robert F. Riley, for intervenor United Gas Pipe Line Co.
 
 
 6
 Judy M. Johnson and J. Evans Attwell, Houston, Tex., for intervenor Texas Eastern Transmission Corp.
 
 
 7
 Patrick B. Pope, Birmingham, Ala., for intervenor Southern Natural Gas Co.
 
 
 8
 John K. MacDonald, Washington, D.C., for intervenor Pennzoil Co.
 
 
 9
 William H. Penniman and Gail S. Gilman, Washington, D.C., for intervenor The Process Gas Consumers Group, et al.
 
 
 10
 John S. Schmid and Barbara K. Heffernan, Washington, D.C., entered appearances for intervenor Bay State Gas Co.
 
 
 11
 Before WALD, Chief Judge, and STARR and D.H. GINSBURG, Circuit Judges.
 
 
 12
 Opinion for the Court filed by Circuit Judge D.H. GINSBURG.
 
 
 13
 Dissenting opinion filed by Circuit Judge STARR.
 
 D.H. GINSBURG, Circuit Judge:
 
 14
 We grant the petition of Laclede Gas Company and United Municipal Distributors Group (collectively, Laclede) for review of an order of the Federal Energy Regulatory Commission rejecting a settlement of certain contested issues among United Gas Pipe Line Company and its customers, including Laclede. United intervenes in support of FERC and argues that we are without jurisdiction, but its jurisdiction argument does not merit discussion.
 
 I. FACTS
 
 15
 In September 1985, United filed a rate application in Docket No. RP85-209-000 (Docket 85). In October, after receiving various objections, FERC accepted the tariff sheets for filing, suspended their effectiveness, and set the case for hearing before an Administrative Law Judge. Thereafter, United and its customers held various meetings at which they attempted to resolve certain disputed issues in Docket 85. In September 1986, the parties submitted to the ALJ a proposed settlement consisting of an Interim Agreement and a Base Agreement (collectively, the Settlement). The Interim Agreement was intended to put into effect the rate changes made by the Base Agreement for the period during which FERC was considering whether to accept the Base Agreement.
 
 
 16
 The Base Agreement provided for various changes in United's rates and contained three other terms of particular relevance here: (1) for the period from May 1, 1986 until FERC accepted the Settlement, United would refund to its customers the difference between its filed rates and the rates it would have collected had the Settlement been in effect during that period; (2) by January 1, 1987, United would make a new rate filing to raise certain enumerated issues that were not resolved by the Settlement; and (3) no provision of the Settlement would become effective until "[a] Final Commission Order approving, without modification or condition, all the terms and provisions of this Agreement shall have been issued...." The ALJ certified the Settlement to FERC.
 
 
 17
 On January 1, 1987, when United's obligation under the Settlement to file a new rate case would have matured, FERC had not yet approved the Settlement. Accordingly, United notified FERC that it would not then make the filing, but that it would make it within 60 days of FERC's order approving the Settlement, and in no event later than April 1. FERC had taken no action on the Settlement when, on March 31, United made its filing in Docket No. RP87-52-000 (Docket 87).
 
 
 18
 On April 30, 1987, FERC accepted for filing the tariff sheets proffered in Docket 87, suspended their effectiveness for five months, and set the case for hearing. Several customers petitioned for rehearing on the ground that, because the filing made certain estimated usage volumes (known as Monthly Entitlement Quantities or MEQs) that they had previously filed with United the basis for determining whether a customer would have to pay overrun charges, they should be permitted to re-estimate those quantities before the new tariff sheets took effect. In response to these concerns, FERC issued an order on July 23 conditioning its acceptance of the Docket 87 tariff sheets upon United's permitting its customers to refigure their MEQs. On September 9, United notified FERC that it would not be filing amendments to its tariff sheets based upon the reestimated MEQs because its pipeline customers had submitted unrealistically low figures, thereby shifting costs to others of United's customers and adversely affecting United's ability to compete. Recognizing that its failure to comply with FERC's conditions would result in the Commission's rejection of the Docket 87 filing, United committed to filing a new rate case by October 1, 1988.
 
 
 19
 In October 1987, FERC issued an order rejecting for filing United's tariff sheets in Docket 87 and terminating that proceeding. At the same time, the Commission rejected the Settlement in Docket 85, stating, in effect, that United had violated the Settlement by its actions in the Docket 87 case:
 
 
 20
 United's failure to comply with the conditions imposed on the acceptance of its filing in Docket has precipitated the rejection of that required filing. This is not what the parties bargained for and is not acceptable to the Commission.
 
 
 21
 United Gas Pipe Line Company, 41 FERC p 61,089 at 61,237 (1987). The result of its rulings, said FERC, was that United's rates would continue to be determined under the pre-Settlement tariff sheets in Docket 85 "with United's customers protected by the refund obligation." Id. at 61,236. The Commission then ordered that hearings proceed in Docket 85 "to address the issues which had been reserved for consideration in Docket ...." Id. at 61,237.
 
 
 22
 Several of United's customers filed petitions for rehearing, arguing that there was substantial doubt whether FERC's statutory power to award refunds would be available in this case and suggesting various alternative means by which FERC's apparent desire to proceed to an immediate hearing on the issues unresolved by the Settlement could be accommodated without rejecting the Settlement and proceeding to a hearing in Docket 85. United itself filed such a petition, committing itself, on the condition that FERC approve the Settlement, to file a new rate case by March 31, 1988 (6 months earlier than its previous, October 1, 1988 commitment), in order to provide the forum that FERC considered essential. FERC denied rehearing nonetheless, and reiterated its view that rejection of the Settlement was justified because United had already violated it and because it was "integral" to the Settlement that there be an immediate forum in which to resolve the issues left open. United Gas Pipe Line Company, 42 FERC p 61,233 at 61,764 (1988). The Commission did not discuss any of the proffered alternative methods of providing such a forum, and it refused to consider, as "premature," the question whether it had authority to grant refunds apart from the rejected Settlement.
 
 II. ANALYSIS
 
 23
 Laclede challenges both of FERC's asserted rationales for rejecting the Settlement and argues, in addition, that FERC erred in refusing to consider the refund issue.
 
 A. United's "Violation" of the Settlement
 
 24
 The Commission asserts that United violated the Settlement in two respects: failing to make a rate filing by January 1, 1987, and refusing to accept the conditions that FERC imposed on its acceptance of United's March 31 filing. In our view, neither action violated the Settlement.
 
 
 25
 Preliminarily, we question whether a three month delay in United's compliance with the Settlement is a sufficient reason for FERC to reject it when the vast majority of the parties continued to support it. Nor are we convinced that a Settlement obligation to file tariff sheets necessarily carries with it an obligation to accept whatever conditions FERC might seek to impose upon their acceptance. Most fundamentally, however, we do not think it is possible for a party to "violate" an agreement by which it is not bound; and the Settlement here expressly provided that (except for United's obligations while the Base Agreement was pending FERC approval) it did not "become effective unless and until ... [a] Final Commission Order approving, without modification or condition, all the terms and provisions of this [Settlement] shall have been issued...." Because the Settlement never became effective and binding on United, FERC's assertion that United had violated it is necessarily in error.
 
 B. The Need for an Immediate Forum
 
 26
 In rejecting the Settlement, FERC also reasoned (1) that it was integral to that agreement that there be an immediate forum for the resolution of the issues it left unresolved, and (2) that it was necessary to reject the Settlement and to set Docket 85 for hearing in order to provide that forum. Laclede challenges both FERC's premise and its conclusion.
 
 
 27
 FERC defends its premise by pointing out that, at the time the parties entered into the Settlement, some of them specifically mentioned that they considered United's obligation to file a new rate case by January 1987 important to the success of the Settlement. When United told FERC it would not comply with the conditions FERC had placed on its acceptance of United's Docket 87 filing, however, only one party (Texas Eastern Transmission Corporation) objected. The other parties to the Settlement were apparently content to wait for United to file its proposed new rate case in October 1988. Therefore, insofar as FERC was purporting to enforce the will of the parties to the Settlement, substantially all of which supported the Settlement at the time FERC denied it, the Commission was acting irrationally. In these circumstances, the relevant intent of the parties was their present intent, when FERC made its decision, to adhere to the Settlement despite the delay, not their original intent that the Settlement be implemented without delay.
 
 
 28
 To be sure, FERC is not required to approve a settlement simply because the parties support it. FERC must also consider the public interest, and insofar as it found the Settlement "not acceptable to the Commission," 41 FERC at 61,237, we understand it to have referred to the public interest. In particular, FERC perceived a public interest in the early resolution on the issues deferred in the Settlement. FERC never explained, however, why it was so critical to move quickly on the unresolved issues that FERC would not approve the Settlement and rely upon United's promised March 1988 filing to provide the necessary forum.
 
 
 29
 Even assuming that FERC was correct about the need for an immediate forum, it is not clear that rejecting the Settlement was necessary to secure such a forum. Various parties suggested four other possibilities to the Commission: (1) UMDG suggested that the Commission approve the Settlement and immediately exercise its power under Sec. 5 of the Natural Gas Act, 15 U.S.C. Sec. 717d, to institute a rate proceeding; (2) Laclede Gas Company suggested that FERC approve the Settlement and, exercising its enforcement authority, order United immediately to file a new rate case; (3) United itself suggested that FERC approve the Settlement and not terminate the Docket 87 proceeding until United made its new rate filing in March 1988, since in that way, the parties could continue discovery in Docket 87, allowing for more expeditious consideration of the 1988 case when filed; and (4) Entex, Inc. and Louisiana Gas Service Company suggested that the Commission approve the Settlement as to all consenting parties and set Docket 85 for hearing only as to the one non-consenting party (Texas Eastern).
 
 
 30
 Laclede argues before this court that it was arbitrary and capricious for FERC to reject the Settlement without considering any of these alternatives. It relies, however, solely on cases holding, in the context of rulemaking under the Administrative Procedure Act, that an agency must consider all reasonable alternatives presented to it. See Motor Vehicle Manufacturers Association v. State Farm Mutual Auto Insurance Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); Walter O. Boswell Memorial Hospital v. Heckler, 749 F.2d 788, 797, 802-03 (D.C.Cir.1984); Farmers Union Central Exchange, Inc. v. FERC, 734 F.2d 1486, 1511 (D.C.Cir.1984); International Ladies' Garment Workers' Union v. Donovan, 722 F.2d 795, 817-18 (D.C.Cir.1983). The Commission responds with a case involving a license proceeding, Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978), which held that the requirement in the National Environmental Policy Act (NEPA) that an agency provide "a detailed statement [considering] alternatives to the proposed action" did not mean that an agency's NEPA statement can "be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man."
 
 
 31
 We need not now decide how the logic of these cases applies in the context of a proceeding under the Natural Gas Act, on review of which "we must uphold the order if it is just and reasonable in its consequences...." East Tennessee Nat. Gas Co. v. FERC, 631 F.2d 794, 798 (D.C.Cir.1980) (citing Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968)). For present purposes, it is enough to say that, where a party raises facially reasonable alternatives to FERC's decision to reject a contested settlement, the agency must either consider those alternatives or give some reason, within its broad discretion over contested settlements, Arctic Slope Regional Corp. v. FERC, 832 F.2d 158, 164 (D.C.Cir.1987), for declining to do so. The court cannot say that the consequences of the agency's rejection are "just and reasonable" if it risks visiting on one party a substantial hardship that, for all that appears in the agency's decision, might be avoided without injury to any other party or to the public interest.
 
 
 32
 Nor may we redeem, as our dissenting colleague argues we should (Dissent at 1504--1505), FERC's failure to consider these alternatives by providing our own explanations for why each of the proffered alternatives was inadequate. Had FERC itself advanced such explanations, we would consider them in determining whether its actions were reasonable. It did not do so, however, and we "must judge the propriety of [administrative] action solely by the grounds invoked by the agency." SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).
 
 C. FERC's Power to Order Refunds
 
 33
 Laclede also contends that, because the Settlement provided for United to make refunds for the period from May 1, 1986 until such time as FERC approved the Settlement, and because there was a substantial dispute over whether the Commission would have the power to order such refunds if the Settlement were not approved, FERC should have considered whether it could later order such refunds before it determined to reject the Settlement. In its initial order, FERC simply asserted that "United's customers [were] protected by the refund obligation." 41 FERC at 61,236. After a number of commenters challenged that conclusion on rehearing, FERC merely repeated its assertion, again without analysis. Assertion and reassertion, without more, is not the reasoned decisionmaking required of an administrative body.*
 
 
 34
 The Commission did also observe that "[r]efunds are a remedy," and held that any concern about the availability of a remedy is appropriately addressed only after the existence of a wrong has been determined. Even assuming that the Commission was correct both that an immediate forum for the resolution of the previously unresolved issues was in the public interest and that none of the alternatives proffered by the parties was satisfactory, however, it does not follow, without more, that the Settlement should be rejected. That depends upon the consequences of rejecting it--which the Commission refused to consider. If the consequence is to foreclose later ordering United to make refunds comparable to those provided for in the Settlement, that may or may not weigh determinatively against rejection--that is for the Commission to decide. If it is immaterial whether the Commission could later order such a refund because, in its judgment, countervailing considerations would still lead it to reject the Settlement and the refunds along with it, let it say so. But willfully to blind itself to the consequences of its actions is neither logical nor within the agency's broad discretion over contested settlements. Many millions of dollars of ratepayers' money may be at stake. When so much depends upon the agency having a sure footing, it is not too much for us to demand that it look first, and then leap if it likes.
 
 III. CONCLUSION
 
 35
 For the foregoing reasons, we grant the petition for review and remand the case to FERC.
 
 
 36
 So Ordered.
 
 STARR, Circuit Judge, dissenting:
 
 37
 This case presents another example of the Federal Regulatory Commission's difficult responsibility to reconcile competing private interests with the broader public interest in reasonable rates. As the court recounts, the Commission in this case ultimately rejected a settlement agreement between United Gas Pipeline Company and its customers because, as the Commission saw it, accepting the settlement meant indefinitely postponing full hearings concerning the reasonableness of United's rates and rate design.
 
 
 38
 Today, the court rejects the Commission's course because, in the court's view, FERC failed convincingly to demonstrate that the public interest in prompt adjudication of the reasonableness of United's rates outweighed the interest of two (of many) United customers (Laclede Gas Company and United Municipal Distributors Group) in proceeding with the settlement, notwithstanding the considerable passage of time. The court also faults the Commission for not discussing all "facially reasonable" alternatives proposed by the two remaining champions of the aging agreement. In my view, the Commission has struck a reasonable balance between private interests in a particular settlement and the broader public interest in reasonable rates. I am therefore constrained, with respect, to dissent.
 
 
 39
 * As the court recounts, in September 1985 United filed a Base Tariff Restatement, as required by FERC regulations. 18 C.F.R. Sec. 154.38(d)(4)(vi) (1988). United declined to seek a general (that is, jurisdiction-wide) revenue increase but proposed certain changes in cost classification, cost allocation and rate design. Most notably, United proposed to adopt the (FERC-favored) Modified Fixed-Variable ("MFV") method for calculating the rates of its interstate pipeline customers. See Elimination of Variable Costs from Certain Natural Gas Pipeline Minimum Commodity Bill Provisions, 49 Fed.Reg. 22778 (June 1, 1984) (discussing pro-competitive impacts of MFV method). Apparently pleased by United's embrace of its favored methodology, the Commission accepted the filing on October 28, 1985. J.A. at 35. United's customers, however, were not nearly so sanguine. Shortly thereafter, settlement negotiations began. Eight months later, a comprehensive settlement was reached and thereupon submitted to an Administrative Law Judge. J.A. at 187. Under the settlement, some of United's customers (including the two petitioners here) received lower rates than those contained in the 1985 filing. The settlement further provided that United would charge the filed rates from October 1, 1985 until April 30, 1986, but would be entitled only to the settlement rates from May 1, 1986 until the expiration of the settlement. Finally, the settlement provided that United would make a general rate filing by January 1, 1987 and that, following Commission approval, this filing would supercede the settlement rates. J.A. at 137-44.
 
 
 40
 For reasons that are not entirely clear, United did not make the promised rate filing until March 31, 1987. Notwithstanding its untimeliness, the filing received FERC's initial approval, J.A. at 236; however, upon rehearing UMDG (which is, of course, one of the petitioners here) and another customer (Mobile Gas Corporation) urged FERC to reject United's long-awaited filing. Specifically, they contended that United's newly formulated demand charge (under the FERC-ordained MFV methodology) would be determined, in part, based on unduly restrictive monthly consumption entitlements (MEQs). J.A. at 266-69. FERC agreed with this objection and conditioned its acceptance of the filing on United's acceding to MEQ renominations from its customers that were equal to or less than the level that could be reached if the customer took its maximum contractual entitlement every day. J.A. at 268-69. In an apparent attempt to minimize their demand charges, three of United's four interstate pipeline customers filed MEQ levels of zero. United was not pleased; it complained that acceptance of these MEQs would unduly harm its ability to compete for non-pipeline customers (by shifting $41 million in demand costs to such customers). Exasperated by this prospect, United threw up its hands and declined to accept the proffered MEQs. J.A. at 279. Thus, as time was wearing on, the Commission was confronted with continuing fractiousness within the singularly non-united United "family" and the lack, as contemplated, of a viable, fresh rate filing.
 
 
 41
 FERC thereupon rejected both the hotly disputed rate filing and the underlying settlement, explaining that the deal struck by the parties (in particular, the provision for an early-1987 rate filing that would supercede the settlement and trigger hearings concerning United's rates) had entirely collapsed:
 
 
 42
 [A]n integral part of this agreement was United's obligation to file a new section 4(e) rate case on January 1, 1987. United's failure to comply with the conditions imposed on the acceptance of its filing ... has precipitated the rejection of that filing. This is not what the parties bargained for and it is not acceptable to the Commission.
 
 
 43
 J.A. at 293. FERC then ordered that the hearings on United's 1985 filing (which had been held in abeyance pending review of the settlement) be resumed, explaining that a prompt, in-depth examination of United's rates was particularly called for because two additional rate controversies had arisen since the settlement had been negotiated. J.A. at 294. At the time of its final order, the Commission consolidated four different proceedings with the hearings on United's 1985 filing and stated that "[i]t is the Commission's intent to provide a single forum for the resolution of a number of outstanding rate issues pending in United's proceedings." J.A. at 358.
 
 
 44
 In my view, the Commission's entire course of action, as I have outlined in somewhat tedious detail, is unexceptionable.
 
 II
 
 45
 The Supreme Court has stressed that the standard of review which guides us is quite limited:
 
 
 46
 Congress has entrusted the regulation of the natural gas industry to the informed judgment of the Commission, and not to the preferences of reviewing courts. A presumption of validity therefore attaches to each exercise of the Commission's expertise, and those who would overturn the Commission's judgment undertake the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.
 
 
 47
 Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1967) (citations omitted). As my colleagues recognize, the Commission is quite at liberty to reject a settlement on public interest grounds (even though one or more parties continue to press in favor of the agreement). Maj.Op. at 1497. In addition, no one has questioned FERC's decision to reject United's 1987 filing. To the contrary, UMDG was clamoring for the Commission to do exactly that--to scuttle United's long-awaited rate filing--even though a new filing was part and parcel of the settlement agreement. The case thus reduces to whether it was reasonable, in light of the parties' failure to find common ground over the long-promised 1987 filing, for FERC (in the midst of the continuing discord) to assign greater importance to a prompt and full examination of the numerous issues that continued to swirl around United's rates than to petitioners' interest in the lower settlement rates. In my view, FERC's decision was eminently reasonable.
 
 
 48
 First. The Commission's orders give teeth to the settlement's express provision requiring United to file a rate case by January 1987. In contrast, the court affords little weight to the parties' intentions as set forth in the settlement. The court initially points out that United never "violated" the settlement because the Commission never approved it. Maj.Op. at 1497. But, as we have seen, the parties agreed to an early 1987 rate filing by United, and it is undisputed that this was an "integral" part of the agreement embodied in the settlement. As time wore on, and certainly in September 1987, when United indicated that it would not comply with the conditions imposed on its earlier (March 1987) filing, it was abundantly evident that United was unable to meet its obligations under the settlement. Whether this is termed a "violation" or not, it is beyond cavil, as FERC emphasized, that the parties had bargained for something quite different than what existed in the autumn of '87.
 
 
 49
 In undoing the Commission's handiwork, the court places much emphasis on the fact that only one party, Texas Eastern Transmission Company ("TETCO"), opposed the settlement based on United's unsuccessful 1987 filing. According to the court, it was "irrational" for the Commission to reject the settlement in these circumstances since "the relevant intent of the parties was their present intent, when FERC made its decision, to adhere to the Settlement despite the delay, not their original intent that the Settlement be implemented without delay." Maj.Op. at 1497. But the fact that the settlement, as negotiated, ultimately collapsed cannot be swept aside solely because some (or even most) parties were still willing to go along (albeit, without a viable United filing). As one of the four interstate pipelines that took gas directly from United, TETCO was obviously no bit player in this drama,[1] and the Commission was certainly entitled to give weight to its interests.[2]
 
 
 50
 More fundamentally, FERC's orders should be viewed in context, with reference to the events as they unfolded. At the outset, in order to accommodate the parties' extended negotiations, FERC postponed hearings on the 1985 filing for more than eight months. Then, when the rate filing required by the settlement was filed three months late and contained questionable MEQ levels, FERC afforded the parties (again, at the behest of, among others, UMDG) an opportunity to renominate the MEQs. When all this failed, and TETCO objected to the settlement, FERC could reasonably conclude that the various parties had devolved into an assemblage of disagreeable cats and dogs seemingly unable (and manifestly unwilling) to work amicably within the full framework of the settlement. In short, before rejecting the settlement, FERC provided the parties ample opportunity to work out their differences.[3]
 
 
 51
 Second. Importantly for our purposes, the Commission never wavered in its view that the settlement served the public interest if and only if full rate hearings were imminent. FERC thereby indicated its view that the settlement suffered from substantive problems but was acceptable for a limited, pre-filing period. The court, however, finds fault with the importance which the Commission assigned to full hearings under United's 1985 filing: "FERC never explained, however, why it was so critical to move quickly on the unresolved issues that FERC would not approve the Settlement and rely upon United's promised March 1988 filing to provide the necessary forum." Maj.Op. at 1497. But context is, once again, important to a full and fair understanding of what transpired. As we have seen, the Commission had witnessed the unhappy disintegration of consensus over United's most-recent filing. As time marched on, FERC was no longer satisfied with "promises" that future filings would be acceptable. That sense of exhaustion is, in my view, hard to fault, especially in light of the Commission's overriding duty to assure reasonable rates.
 
 
 52
 Third. Any hardship inflicted by loss of the settlement appears to be modest. Although the settlement guarantees rates somewhat lower than those contained in United's 1985 filing, without the settlement petitioners are left in the baseline position contemplated by the Natural Gas Act, namely the implementation of filed rates subject to refund. See Papago Tribal Util. Auth. v. FERC, 628 F.2d 235, 240-41 (D.C.Cir.1980). This result seems to me hardly so exacting as to override the public interest (as seen by FERC) in reasonably prompt rate hearings.
 
 
 53
 The court views petitioners' asserted plight differently. My colleagues worry that petitioners will not be protected by the Commission's refund authority and fault FERC for failing to declare that its refund power applies where, as here, a utility has not sought a jurisdiction-wide rate increase. Maj. op. at 1498-99. The court's concern is, I think, based on an unnecessarily narrow interpretation of the orders under review. As I read the orders, FERC never expressed doubt about its authority to order full refunds. In its initial order rejecting the settlement, the Commission stated that the 1985 rates "have been in effect on the United system subject to refund since October 1, 1985." J.A. at 291. In its order on rehearing, FERC reaffirmed this view: "The customers' concerns result from what they see as a limitation on the Commission's authority to order refunds in this proceeding. The Commission's October 29, 1987 order states that United's customers will be protected by the refund obligation." J.A. at 355 (emphasis supplied). These statements are simply not, in my view, redolent of an agency agonizing over its statutory authority.[4]
 
 
 54
 Finally, the court faults FERC for failing to consider "facially reasonable" alternatives to rejecting the settlement. This is a significant step, which petitioners have invited the court to take as if this were a well-worn path in the law. The leading case overturning an agency's decision for failure to consider alternatives is, of course, the airbags case, Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1982). That familiar decision, on which petitioners place their primary reliance, involved review of informal rulemaking. Neither the Supreme Court nor (as far as I can tell) this court has heretofore specifically applied the State Farm approach to an agency adjudication. While we obviously need not (and should not) embrace a rigid rule that agencies are never required to consider alternatives in adjudicatory settings, we should, I believe, be very cautious indeed about injecting wholesale State Farm 's methodology into this distinct area of administrative law. Here, briefly, is why.
 
 
 55
 To return to basics: The distinction between rulemaking and adjudication is fundamental to the structure ordained by the Administrative Procedure Act, 5 U.S.C. Sec. 553 (1982):
 
 
 56
 [T]he entire Act is based upon a dichotomy between rule making and adjudication.... Rule making is agency action which regulates the future conduct of either groups of persons or a single person; it is essentially legislative in nature, not only because it operates in the future but also because it is primarily concerned with policy considerations.... Conversely, adjudication is concerned with the determination of past and present rights and liabilities.
 
 
 57
 Bowen v. Georgetown Univ. Hosp., --- U.S. ----, 109 S.Ct. 468, 477, 102 L.Ed.2d 493 (1988) (Scalia, J., concurring) quoting, The Attorney General's Manual on the Administrative Procedure Act, at 13-14 (1947). The legislative nature of rulemaking suggests that consideration of a broad range of alternatives is much more likely to be an integral component of reasoned decisionmaking in that setting. This conclusion is underscored by the ready analogy between rulemaking's notice-and-comment procedures and the democratic process. In contrast, reasoned decisionmaking in the adjudicatory context has not traditionally hinged on an examination of all plausible alternative approaches, and the adjudicatory setting seems inherently ill-adapted to that undertaking. Adjudicatory bodies are called upon to examine the facts and the law and come to what seems to the tribunal (or agency) a reasoned, principled decision. That may, or may not, involve consideration of "alternatives."[5]
 
 
 58
 Even assuming some scope for a State Farm-like requirement in the review-of-settlement setting, I do not think that petitioners' proposed alternatives are of such force as to warrant a response from FERC. This is best illustrated by the Supreme Court's approach in State Farm itself. There, as most readers will readily recall, the Court reviewed the Department of Transportation's decision to rescind a requirement that new motor vehicles be equipped with either airbags or passive restraint-genre seat belts. DOT eventually decided against the seatbelt option, but rescinded the standard entirely without discussing the efficacy of an airbags requirement. In explaining the inadequacy of DOT's decision, the Supreme Court emphasized the obviousness of the airbags option, as evidenced by DOT's endorsement of airbags in its then-extant rule. State Farm, 463 U.S. at 51, 103 S.Ct. at 2871.
 
 
 59
 My point is that DOT's refusal, in the context of the exercise of its delegated legislative power, to consider the employment of airbags is a far cry from FERC's refusal to consider various alternative fora proposed by petitioners. None of petitioners' proposed alternatives even purports to provide a forum comparable to that afforded by United's 1985 rate filing. Petitioners' proposals that FERC (1) order United to make a new filing or (2) allow discovery under the 1985 filing until United's next filing would have spawned still more delay. More importantly, these options presumed that United's next filing would prove acceptable both to the Commission and to United's lively set of customers. Yet, as we have seen, this was manifestly not the case with United's much maligned March 1987 filing. Hope springs eternal, but the Commission should not, on pain of remand, be required to embrace such a cheerfully optimistic approach to these arcane, dispute-ridden questions.
 
 
 60
 Another proposed "alternative," namely that the Commission sever any parties contesting the settlement, does not even purport to provide for general hearings on United's rates. That defect is sufficiently striking that this particular entry on petitioners' creative option plan seems, on reflection, to be tossed in for good measure, rather than genuinely, enthusiastically championed.
 
 
 61
 Finally, petitioners propose that FERC institute its own proceeding under section 5 of the Natural Gas Act, 15 U.S.C. Sec. 717d (1982). This suggestion runs afoul of well-established traditions of letting the agencies order their own affairs, rather than having courts, through the judicially convenient device of resource-consuming remands, for all practicable purposes tell the agencies how to run their respective railroads. This alternative also ignores substantial (and well-known) differences between section 5 proceedings, on the one hand, and rate proceedings under section 4 of the Natural Gas Act, on the other:
 
 
 62
 Each section deals with a different character of agency action; each is responsive to different circumstances, and is subject to different restrictions. The Commission is not free to blend, or pick and choose at will between, its section 4 and 5 authority.
 
 
 63
 Sea Robin Pipeline Co. v. FERC, 795 F.2d 182, 183 (D.C.Cir.1986); see also Northern Natural Gas Co. v. FERC, 827 F.2d 779, 781, 788 (D.C.Cir.1987) (en banc ). Petitioners make no attempt to demonstrate that section 5 proceedings are, in fact, suitable in the present context. The problems are obvious. Among other things, the Commission's authority to order refunds is sharply circumscribed (if not non-existent) in section 5 proceedings. Id. at 184. In contrast to section 4 proceedings, in which the filing utility bears the burden of proving the reasonableness of its proposed rate changes, in section 5 proceedings the burden shifts to the Commission (or adversely affected private parties) to prove the reasonableness of departures from the existing rates. Id. In the present case, a section 5 proceeding would place substantially greater burdens on the Commission without affording full refunds to petitioners.
 
 
 64
 In sum, even assuming that State Farm's approach applies in adjudicatory settings, that case requires petitioners' to show that the offered alternatives have a reasonable claim to solving the problem at hand.[6] Petitioners have not met that burden. Quite the contrary; the court has allowed petitioners to shoot down FERC's orders by sending up a few trial balloons. That approach, with all respect, fails to comport with our limited scope of review. I therefore respectfully dissent.
 
 
 
 *
 But see Lewis Carroll, The Hunting of the Snark, Fit the First, The Landing (1876):
 "Just the place for a Snark!" The Bellman cried,
 As he landed his crew with care;
 Supporting each man on the top of the tide
 By a finger entwined in his hair.
 "Just the place for a Snark! I have said it twice;
 That alone should encourage the crew.
 "Just the place for a Snark!--I have said it thrice;
 What I tell you three times is true."
 
 
 [1]
 Petitioners contend that TETCO's opposition to the settlement was mooted when, prior to FERC's final order in this case, United agreed to transfer all matters relating to its take-or-pay buyout expenses to a parallel proceeding. See 41 FERC p 61,381 (1987). TETCO's objections to the settlement were not, however, limited to the absence of a forum for litigation of take-or-pay issues. J.A. at 222-26
 
 
 [2]
 Our case is, of course, to be distinguished from situations in which the Commission approves (and gives effect to) provisions of a settlement despite the non-unanimity of the parties. See 18 C.F.R. Sec. 385.602(h) (1988) (approval of a contested settlement constitutes a ruling on the merits that must be supported by "substantial evidence"); see also United Mun. Distributors Group v. FERC, 732 F.2d 202 (D.C.Cir.1984). Here, the court holds that FERC abused its discretion by taking account of the fact that the settlement's provision for imminent rate hearings went unfulfilled
 
 
 [3]
 The evanescent character of any "agreement" to retain the settlement notwithstanding United's flawed filing is underscored by recent events. Although at the time of FERC's final order, United continued to press for approval of the settlement, United now states that "[t]he climate and conditions of the natural gas industry and United have changed drastically since the Interim Settlement and Base Agreement were negotiated ... United is no longer in a position to accept those agreements." Brief of United at 5. Similarly, on November 28, 1988, United filed a new settlement proposal with the Commission, but petitioners declare that they do not intend to consent to the proposal, if approved by FERC. Reply Brief at 7-8 n. 5
 
 
 [4]
 The court views another passage in the order as evidence that FERC simply ignored the refund issue as premature. Maj. Op. at 1499. In the passage cited for this proposition, however, FERC simply stated that, even if it was wrong about refunds, it would still have rejected the settlement: "The fact that the available potential remedies may have been better under the Agreement ... does not justify retaining the Agreement in the face of the Commission's reasons for rejecting it." J.A. at 356. Far from indicating that FERC simply ignored the refund issue, this alternative rationale strikes me as further evidence that the Commission has adequately addressed this question
 It is also worth noting that there is little to support the court's conclusion that, in the absence of refund authority, rejection of the settlement inflicts "substantial hardship" on petitioners. Maj. Op. at 1498. UMDG avers that its members (when considered together) would be entitled under the settlement to an additional $2 million for the period May 1986-October 1987. J.A. at 303. Laclede states only that its pipeline supplier, the Mississippi River Transmission Company ("MRT"), stands to lose "about $24 million" if the settlement is rejected; Laclede then admits that, as only one of MRT's many customers, its share of this difference would be considerably less. Brief of Petitioners at 20-21 & n. 17. From all that appears, petitioners' financial interest is relatively modest. In a general rate case of this size, it is, standing alone, not the stuff of which judicial invalidation of agency action, on grounds of hardship arbitrarily inflicted, is made.
 
 
 [5]
 To be sure, a court making a traditional equitable determination (such as consideration of a request for injunctive relief) relies on a body of law which emphasizes the careful, respectful analysis of the entire factual setting and a balancing of sometimes competing factors. It is possible, therefore, that a State Farm-type approach may in practice be subsumed under the rubric of equitable analysis when an adjudicatory tribunal (including an agency) is, in practical effect, "sitting in equity." But we have not, even where that is so, translated the arbitrary-capricious standard of the APA so as to require rigid adherence to a State Farm mode of analysis
 
 
 [6]
 This approach does not require the court impermissibly to "supply a reasoned basis for the agency's action that the agency itself has not given." State Farm, 463 U.S. at 43, 103 S.Ct. at 2867, citing, SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). In the present case, the Commission has explained its decision; the only question is whether the decision, as explained, is arbitrary and capricious. See 5 U.S.C. Sec. 706(2)(A) (1982). To repeat: that standard does not generally (or at least inexorably) require consideration of alternatives. Indeed, in a case decided under the APA and the National Environmental Policy Act, the latter of which expressly requires "a detailed statement by the responsible official on alternatives to the proposed action," 42 U.S.C. Sec. 4332(C) (1982), the Supreme Court stated that "[c]ommon sense also teaches us that the 'detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man." Vermont Yankee Nuc. Power Corp. v. NRDC, 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1977). This brand of common sense is even more appropriate where, as here, there is no specific statutory directive to consider alternatives